UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------

SECURITIES AND EXCHANGE
COMMISSION,
                            Plaintiff,

                -v-

ARON GOVIL,
                            Defendant.

21-CV-6150 (JPO)

OPINION AND ORDER

---------------------------------------------------------------

J. PAUL OETKEN, District Judge:

       Plaintiff Securities and Exchange Commission ("SEC") brings this action against Defendant Aron Govil, asserting violations of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77a *et seq.*, and violations of the Securities Exchange Act of 1934 (the "Exchange Act"), 14 U.S.C. §§ 78a *et seq.* (Dkt. No. 1 ("Compl.").) Before the Court now is the SEC's motion for judgment imposing additional remedies as to Count I (Dkt. No. 14), which Govil opposes (Dkt. No. 18).

       For the following reasons, the SEC's motion is granted in part and denied in part.

**I.      Factual Background**

       On July 19, 2021, the SEC filed a complaint charging Govil with violations of the Securities Act and the Exchange Act. (*See* Compl.). The following month, this Court entered a partial judgment against Govil upon his consent. (Dkt. No. 7.) In the partial judgment, Govil consented to all the relief the SEC sought to fully settle Counts II, III, and IV, and the non-monetary relief the SEC sought with respect to all counts. (*Id.*) Thus, the sole remaining issue before the Court is the monetary relief, if any, on Count I.

As relevant to this motion, Count I of the Complaint alleges that from 2016 to 2017, Govil directed Cemtrex, a purported diversified industrial and technology company, to engage in fraudulent securities offerings.  (Compl. ¶ 2.)  Specifically, the Complaint alleges that Govil caused Cemtrex to represent to investors that the offering proceeds would be used for corporate purposes, but in fact, Govil misappropriated $7,335,000 and used these funds to pay for unrelated personal expenses.  (*See* Compl. ¶¶ 22–28.)

On February 26, 2021, Govil entered into a settlement and release agreement (the "Settlement Agreement") with Cemtrex.  (*See* Dkt. No. 16-9.)  Based on the terms of the Settlement Agreement, Govil agreed to pay Cemtrex $7.1 million in the form of (1) Cemtrex stock owned by Govil and valued at $5,566,720 and (2) a promissory note in the amount of $1,533,280 issued by Govil payable with interest within two years (*i.e.*, by February 26, 2023).  (Dkt. No. 16-9 at 1.)  In exchange, Cemtrex released the company's claims against Govil.  (*Id.*)  While Govil has surrendered all of his Cemtrex stock, he has not yet paid Cemtrex pursuant to the promissory note.  (Dkt. No. 15 at 6.)

## II.    Discussion

### A.    Additional Disgorgement of $7,335,000

Disgorgement is an equitable remedy that compels a defendant to "give up the amount by which he was unjustly enriched."  *SEC v. Tome*, 833 F.2d 1086, 1096 (2d Cir. 1987) (internal quotation marks omitted).  Disgorgement is designed to "strip wrongdoers of their ill-gotten gains," but it is not meant to be used as a "punitive sanction."  *Liu v. SEC*, 140 S. Ct. 1936, 1942 (2020).  "The Court has broad discretion in calculating the amount defendants should pay in disgorgement."  *SEC v. Rinfret*, No. 19 Civ. 6037, 2020 WL 6559411, at *5 (S.D.N.Y. Nov. 9, 2020).  However, as noted above, because disgorgement is not meant to serve a punitive

function, "the disgorgement amount may not exceed the amount obtained through the wrongdoing." *SEC v. Wyly*, 56 F. Supp. 3d 394, 403 (S.D.N.Y. 2014).

The SEC argues that the Court should order Govil to disgorge an additional $7,335,000. (*See* Dkt. No. 15 at 7–12.) This is the amount the parties stipulated was transferred to Govil's personal bank account and is the "total proceeds of the fraudulent offerings less the amount of the offering expenses and the amount that remained with the issuer for corporate expenses." (Dkt. No. 15 at 8.) The SEC plans to distribute these disgorged funds to harmed investors, who, according to the SEC, are readily identifiable. (Dkt. No. 15 at 8–9.) Govil counters that if the Court decides that additional disgorgement is warranted, the amount should be reduced by the amount Govil agreed to pay under the Settlement Agreement, resulting in an additional disgorgement of only $235,000. (Dkt. No. 18 at 10.)

The SEC first argues that the disgorgement should not be reduced by $7.1 million because the payments via the Settlement Agreement were "personal in nature" and should not be treated as business expenses that can be deducted from the disgorgement. (Dkt. No. 15 at 10–11.) In *Liu*, the Supreme Court held that equitable disgorgement must be limited to the ill-gotten gains by the wrongdoer, or "the gains made upon any business or investment, when both the receipts and payments are taken into account." 140 S. Ct. at 1949–50 (internal quotation marks omitted). The Court also recognized that "expenses" may be "wrongful gains under another name." *Id.* at 1950 (internal quotation marks). For instance, in a D.C. Circuit decision following *Liu*, the court concluded that the continuing-education expenses paid for by misallocated funds was appropriate for disgorgement. *Springsteen-Abbott v. SEC*, 989 F.3d 4, 9 (D.C. Cir. 2021). As an initial matter, the Court disagrees with the SEC's characterization that the Settlement Agreement was strictly "personal in nature" simply because Cemtrex released Govil from

3

liability in exchange for the repayment of $7.1 million.  More to the point, however, is that this argument misses the relevant question, which is whether Govil's surrendering of stock and promise of additional payment *to* Cemtrex rights the wrongs to the actual victim of his misconduct.  After all, if Cemtrex is the victim, then the Settlement Agreement would have properly "pa[id] . . . a fair compensation to the person wronged," *Tilghman v. Proctor*, 125 U.S. 136, 146 (1888), and requiring additional disgorgement would then serve as an improper punitive measure.  Thus, the issue is whether the Settlement Agreement should be considered as a form of disgorgement itself.

      This brings us to the crux of the issue between the parties.  The SEC contends that the investors in the notes offerings and the rights offerings are the victims of Govil's misconduct, and they, not Cemtrex, should receive repayment.  (Dkt. No. 15 at 9–10.)  Govil, in contrast, argues that the Complaint "allege[s] a classic executive misappropriation scheme . . . and which specifically identif[ies] Cemtrex as the victim of Govil's alleged misconduct."  (Dkt. No. 18 at 15–16.)

      The Court agrees with the SEC that the investors are victims of Govil's misconduct.  They were promised that the proceeds of the offerings "would be used for various corporate purposes, including new product development and acquisitions, as well as repaying outstanding debt and other general corporate purposes."  (Compl. ¶ 25.)  But this was a lie.  Govil instead transferred $7.335 million into his own bank account and used those funds to pay for personal expenses and other ventures unrelated to Cemtrex.  (Compl. ¶ 28.)  Thus, while Govil had represented to the investors that their offerings proceeds would be used for corporate purposes, ostensibly in order to secure their investments, they were in fact misappropriated by Govil for personal purposes.  It can hardly be said that an individual who invests in a company because he

4

believes his investments are being used to help that company, but whose investment is then used to pay for unrelated expenses, is not the victim of said scheme.

Having concluded that the investors are the real victims of Govil's misconduct does not, however, end the inquiry. The Court must still consider whether the Settlement Agreement serves as a sufficient equitable remedy. On the one hand, the Court concludes that Govil's surrender of his stock — valued at $5,566,720 — should not be deducted from the $7,335,000 disgorgement request. As the SEC notes, after transferring his control stock to Cemtrex, Govil's son obtained sole voting control over the company, Govil was released from liability, and Cemtrex shareholders received nothing. (Dkt. No. 21 at 4.) Only Govil and his son benefitted from Govil's surrender of stock, a result that runs counter to the purposes of disgorgement.

On the other hand, the Court agrees with Govil that the amount of the promissory note, assuming it is paid to Cemtrex by February 26, 2023, should be deducted. The promise to the investors was that their offering proceeds would be used for Cemtrex expenses. As the funds from the promissory note will presumably be placed in the company's account and used for corporate expenses, the original promise to the purchasers of the offerings will, in fact, be realized. Thus, this payment is similar to those contemplated in *SEC v. First Jersey Secs., Inc.*, where the Second Circuit held that district courts have the discretion to reduce disgorgement for settlements paid to victims. 101 F.3d 1450, 1475 (2d Cir. 1996). The Court will exercise its discretion in reducing the disgorgement amount by the amount of the promissory note.

The Court therefore concludes that disgorgement in the amount of $5,801,720 is appropriate here.[1] The SEC has represented that it is feasible to identify the victims of the fraud.

---

[1] Because the Court concludes that disgorgement in the amount of $5,801,720 is appropriate, it declines to address the SEC's argument that the valuation of the preferred stock is not credible. (Dkt. No. 15 at 10–11.)

However, if it later determines that distribution to investors is infeasible, it must update the Court to permit consideration of whether directing such proceeds to the Treasury is permissible. *See SEC v. Penn*, No. 14 Civ. 581, 2021 WL 1226978, at *14 (S.D.N.Y. Mar. 31, 2021).

### B.     Prejudgment Interest of $1,320,654.29

The SEC also requests that the Court direct Govil to pay prejudgment interest on the amount of disgorgement. "Awarding prejudgment interest, like the remedy of disgorgement itself, is meant to deprive wrongdoers of the fruits of their ill-gotten gains from violating securities laws . . . . Because a defendant has use of the unlawful profits from the time of the wrongdoing until entry of judgment, prejudgment interest is necessary to capture the full measure of the defendant's ill-gotten gains." *SEC v. Universal Express, Inc.*, 646 F. Supp. 2d 552, 566 (S.D.N.Y. 2009) (internal quotation marks and citations omitted).

Because the Court concludes that disgorgement in the amount of $5,801,720 is appropriate, the SEC is directed to recalculate the prejudgment interest accordingly and submit a letter within a month after the issuance of this Opinion and Order informing the Court of the revised amount.

### C.     Additional Civil Penalties

Finally, the SEC requests that the Court order an additional civil penalty of $16,056,870 against Govil, pursuant to the Securities Act, 15 U.S.C. § 72t(d)(2)(A)–(C), and the Exchange Act, 15 U.S.C. § 78u(d)(3)(B)(i)–(iii). (Dkt. No. 15 at 13–17.) This amount is equal to the gross pecuniary gain of the offering frauds charged in Count I, inclusive of the offering proceeds that Govil did not misappropriate. (Dkt. No. 15 at 13.) The SEC argues that an additional penalty equal to the gross pecuniary gain is warranted here because Govil's conduct was egregious. (Dkt. No. 15 at 16.) Govil argues that the $16 million penalty is not authorized by the Securities

6

Act or the Exchange Act because it exceeds the "gross pecuniary gain to the defendant," (*i.e.*, the $7,335,000 that Govil transferred to his account). (Dkt. No. 18 at 20–22.) Govil further contends that if the Court is to impose an additional penalty, one Tier III penalty of $207,183 is appropriate.

Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act authorize the imposition of civil penalties in three tiers. "Such penalties are designed to deter future violations of the securities laws and thereby further the goals of encouraging investor confidence, increasing the efficiency of financial markets, and promoting the stability of the securities industry." *Universal Express*, 646 F. Supp. 2d at 567 (internal quotation marks omitted). The Securities Act and Exchange Act outline three tiers of civil penalties depending on the severity of the violation. "The first tier[] operates whenever any person has violated any provision of [the Acts]. The second tier requires fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement, and the third tier applies when such violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." *SEC v. Bronson*, 246 F. Supp. 3d 956, 977 (S.D.N.Y. 2017).

The imposition and amount of any penalty rest squarely in the discretion of the courts. *See id.* In assessing what, if any, penalty to impose, courts typically consider: (1) the egregiousness of the violations; (2) the defendant's scienter; (3) the frequency of the violations; (5) the defendant's refusal to admit to wrongdoing; (5) whether the defendant's conduct result in substantial losses to other persons; (6) the defendant's lack of honesty with authorities; and (7) whether the penalty should be reduced due to the defendant's demonstrated financial situation. *See SEC v. Lybrand*, 281 F. Supp. 2d 726, 730 (S.D.N.Y. 2003).

In light of the foregoing factors, Govil's conduct warrants imposition of a third-tier penalty. On three occasions, Govil caused Cemex to falsely represent to potential investors that any offering proceeds would be used for business expenses, but in fact, used them for his own personal expenses. He therefore repeatedly lied to investors in order to obtain investments he would go on to use for his personal benefit. Moreover, Govil again lied during the SEC investigation, attempting to evade responsibility by falsely claiming that the bank account where $7.3 million had been transferred did not belong to him. (Dkt. No. 15 at 15.) However, on the other side of the equation is the fact that though there was a risk of significant loss, the investors may not have been financially harmed as a result of Govil's misconduct. (*See* Dkt. No. 18 at 16). And the Court must also consider "the extent to which other aspects of the relief and/or judgment issued in this matter will have the desire punitive effect." *Universal Express*, 646 F. Supp. 2d at 568. Govil, an individual defendant, will have to pay over $6 million in disgorgement and prejudgment interest for this count alone and was required under the consent agreement to pay a $620,000 penalty for the other counts. (*See generally* Dkt. No. 7.) These penalties "lessen the responsibility of the fine to provide a retributive and deterrent effect." *SEC v. Credit Bancorp, Ltd.*, No. 99 Civ. 11395, 2002 WL 31422602, at *4 (S.D.N.Y. Oct. 29, 2002).

The Court need not determine whether a fine of the total gross pecuniary gain is allowable because in light of these considerations, the Court concludes that a penalty of $621,549 – the combined statutory maximum amount for the three Tier III violations – is appropriate.

### III.   Conclusion

For the foregoing reasons, the SEC's motion for additional remedies is granted in part and denied in part. Within four weeks after the issuance of this Opinion and Order, the SEC

shall submit a revised prejudgment interest calculation based on the revised disgorgement amount and a proposed final judgment.

The Clerk of Court is directed to close the motions at Docket Number 14.

SO ORDERED.

Dated: May 24, 2022
       New York, New York

_____
J. PAUL OETKEN
United States District Judge