UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE
COMMISSION,

       Plaintiff,

    -v-

ARON GOVIL,

       Defendant.

21-CV-6150 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

  Plaintiff Securities and Exchange Commission (the "SEC") brings this action against Defendant Aron Govil, asserting violations of the Securities Act of 1933, 15 U.S.C. §§ 77a *et seq.*, and violations of the Securities Exchange Act of 1934, 14 U.S.C. §§ 78a *et seq.*  (ECF No. 1 ("Compl.").)  Before the Court now, following a remand from the Second Circuit, is the SEC's renewed motion for judgment imposing additional remedies as to Count I (ECF No. 55), which Govil opposes (ECF No. 59).  For the reasons that follow, the SEC's motion is granted.

## I. Background

### A. Factual Background

  The following facts are taken from the parties' submissions and are undisputed unless otherwise indicated.  Cemtrex, Inc. is an industrial and technology company.  (ECF No. 1 ("Compl.") ¶ 15.)  Govil, who founded Cemtrex over twenty years ago, was an officer of the company until September 2020 and at all relevant times controlled Cemtrex's operations, including its securities offerings and related press releases.  (*Id.* ¶¶ 19-21; ECF No. 19 ¶¶ 7, 12.)  Govil also maintained voting control over Cemtrex until March 2021.  (Compl. ¶ 19.)  Cemtrex's common stock began trading on the NASDAQ Capital Markets in June of 2015.  (ECF No. 57-

25 ¶ 15.)  In addition to its common stock, Cemtrex also issued various series of preferred stock, including Series 1, Series A, and Series C preferred shares.  (*Id.* ¶ 16.)

At issue in the underlying dispute are three separate securities offerings that Govil directed Cemtrex to engage in between 2016 and 2017 (collectively, the "Offerings").  First, in April 2016, Govil directed Cemtrex to sell a convertible note in the amount of $525,000, at a $25,000 discount, to a single institutional investor.  (ECF No. 57-1 at 2.)  As Cemtrex disclosed publicly in its filings with the SEC, the proceeds were to be used for growth capital and planned acquisitions.  (ECF No. 57-24 ¶ 2(a).)  The note carried a high interest rate and converted shares were issued to the investor at a per-share price of 80% of the market trading price.  (ECF No. 19 ¶ 21.)  The investor converted his note to Cemtrex common stock in three tranches, with the final conversion occurring on October 31, 2016.  (ECF No. 57-2 at 2.)

Second, near the end of 2016, Govil directed Cemtrex to provide all existing shareholders of Cemtrex common stock the opportunity to purchase a "unit" of Cemtrex equity.  (ECF No. 57-24 ¶ 2(b).)  Each unit was priced at $10 and consisted of one share of Series 1 Preferred Stock, paying dividends at the rate of 10% of the purchase price per year, and two Series 1 Preferred Warrants, convertible into common stock at a per-share exercise price of $6.31.  (ECF No. 57-9 at 2.)  Cemtrex issued more than 1.4 million units of this subscription rights offering to more than 100 unique shareholders, netting Cemtrex $11,751,861.60.  (ECF No. 57-24 ¶ 2(b).)  As Cemtrex disclosed publicly in its SEC filings, the proceeds from the offering were to be used for corporate purposes, including to fund product development, to supplement operating cash flows, and to support planned acquisitions.  (*Id.*)

Third, in November 2017, Govil directed Cemtrex to sell an additional convertible note with a face value of $2.3 million to a single institutional investor, netting Cemtrex $1.95 million.

(ECF No. 19 ¶ 23.)  The note carried a high interest rate and converted shares were issued to the investor at a per-share price of 90% of the market trading price.  (ECF No. 57-3 at 2.)  The investor converted his note to Cemtrex common stock in several tranches, with the final conversion occurring on July 10, 2019.  (ECF No. 57-4.)  The proceeds from the offering were to be used for general corporate purposes.  (ECF No. 57-24 ¶ 2(c).)

In total, the net proceeds to Cemtrex from the Offerings approximated $14.2 million. (ECF No. 57-24 ¶ 3.)  For each offering, Cemtrex represented, both to offerees in the individual transactions and to general investors through public filings and press releases, that the proceeds would be used to fund Cemtrex's corporate purposes.  (*See, e.g.*, Compl. ¶ 25; ECF No. 57-5 at 6; ECF No. 57-6 at 2; ECF No. 57-13 at 6.)  But these representations were false.  Rather than use the proceeds for Cemtrex's stated purposes, Govil misappropriated $7.3 million, over half of the funds raised in the Offerings, by using them to pay for personal expenses and to finance business ventures unrelated to Cemtrex.  (Compl. ¶ 26-28.)

After the SEC initiated an investigation, but before the commencement of this enforcement action, Govil executed a settlement agreement (the "Settlement Agreement") with Cemtrex.  (ECF No. 57-22.)  Govil negotiated the terms of the Settlement Agreement with Cemtrex through a Cemtrex director, Sunil Verma, whom Govil could fire at will and who had known Govil since the two were college classmates.  (ECF No. 57-29 at 46-47; ECF No. 57-30 at 14.)  In the course of negotiations, Govil commissioned Stonebridge Advisory, a certified appraiser, to prepare two appraisals of the value of his shares in Cemtrex stock.  (ECF No. 57-31; ECF No. 57-32.)  The terms of the Settlement Agreement, which resolved all controversies between the parties, required Govil to pay Cemtrex $7.1 million through the transfer of 1 million Series A Preferred Stock, 50,000 shares of Series C Preferred Stock, 469,949 shares of Series 1

Preferred Stock, and the forfeiture of all options to purchase shares of common stock.  (ECF No. 57-22 at 2*.*)  The Settlement Agreement placed the collective value of Govil's surrendered stocks at $5,566,720.  (*Id.*)  Govil also agreed to pay $1,533.280 through a secured promissory note. (*Id.*)  Cemtrex's latest annual report discloses that the promissory note has matured and remains unpaid.  (ECF No. 57-21 at 5.)

### B. Procedural Background

On July 19, 2021, the SEC commenced this action against Govil.  (Compl.)  On Govil's consent, this Court entered a partial judgment against him resolving three of the four counts set out in the SEC's complaint.  (ECF No. 7.)  Govil deferred resolution of the appropriate monetary remedies as to the remaining count, which alleged that Govil had violated federal law by misappropriating the Offerings proceeds.  (*Id.* at 6-7; *see also* Compl. ¶¶ 58-61.)  Govil also agreed for purposes of monetary relief that the allegations in the SEC's complaint would be accepted as true and that the Court may determine the issues raised in the motion on the basis of affidavits, declarations, excerpts of sworn deposition or investigative testimony, and documentary evidence, without regard to the standards for summary judgment set out in the Federal Rules of Civil Procedure.  (ECF No. 7 at 7.)

On May 24, 2022, this Court ordered Govil to disgorge $5,801,720 plus prejudgment interest.  (ECF No. 22 at 6.)  Govil had not challenged the propriety of disgorgement or the amount and instead only argued that the Court should subtract from the disgorgement amount the $7.1 million he had purported to transfer to Cemtrex in the Settlement Agreement.  (ECF No. 18 at 12.)  The Court concluded that the value of the securities transacted in the Settlement Agreement would not be subtracted from the disgorgement request, but the Court did subtract the face value of the promissory note.  (ECF No. 22 at 4-6.)  The Court further ordered Govil to pay a penalty of $621,549.  (*Id.* at 8.)

On appeal, the Second Circuit vacated the Court's judgment and remanded, holding that the Court must determine that Govil's victims suffered pecuniary harm before awarding disgorgement. *SEC v. Govil*, 86 F.4th 89, 98 (2d Cir. 2023). The Second Circuit further held that the Court "must undertake a valuation of the surrendered securities" from the Settlement Agreement "and offset the disgorgement award by that amount." *Id.* at 106.

After additional discovery on remand, the SEC renewed its motion for judgment imposing additional remedies. (ECF No. 55 ("Mot.").) The SEC filed an accompanying memorandum of law in support (ECF No. 56 ("Mem.")) alongside, among other things, an expert report by Dr. Marina Martynova (ECF No. 57-25 ("Martynova Report")). Govil opposed (ECF No. 59) and the SEC filed a reply in further support (ECF No. 61).

## II.    Legal Standard

"In any action or proceeding brought by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may order, disgorgement." 15 U.S.C. § 78u(d)(7). "Once the district court has found federal securities law violations, it has broad equitable power to fashion appropriate remedies." *SEC v. Sourlis*, 851 F.3d 139, 146 (2d Cir. 2016) (quotation marks omitted). This includes the discretion "not only to order the disgorgement of any ill-gotten gains, but also to determine the amount to be disgorged." *SEC v. Universal Exp., Inc.*, 646 F. Supp. 2d 552, 563 (S.D.N.Y. 2009) (Lynch, J.), *aff'd*, 438 F. App'x 23 (2d Cir. 2011) (summary order). Furthermore, "[i]n connection with a disgorgement award, the district court has discretion to require the defendant to pay prejudgment interest for the period during which he had the use of his unlawful gains." *SEC v. Razmilovic*, 738 F.3d 14, 35-36 (2d Cir. 2013), *as amended* (Nov. 26, 2013).

### III.    Discussion

The SEC argues that disgorgement is appropriate because Govil's victims—in particular, both Cemtrex and its investors—suffered pecuniary harm.  (Mem. at 27-31.)  The SEC also argues that unrebutted expert opinion in the record supports a conclusion that the securities Govil traded in the Settlement Agreement are of much lower value than as purported in the agreement, justifying a disgorgement award of $6,670,977.  (*Id.* at 31.)  The SEC lastly requests the Court to order Govil to pay prejudgment interest.  (*Id.* at 31-32.)  The Court takes each argument in turn.

### A.    Pecuniary Harm

The Second Circuit has held that disgorgement is an equitable remedy such that the award is "for victims."  *SEC v. Ahmed*, 72 F.4th 379, 396-97 (2d Cir. 2023) (quoting *Liu v. SEC*, 591 U.S. 71, 75 (2020)), *cert. denied sub nom. Ahmed v. SEC*, 144 S. Ct. 2658 (2024).  Moreover, purported victims must suffer pecuniary harm to justify the awarding of disgorgement.  *Govil*, 86 F.4th at 105.

On remand, the SEC offers testimony and expert reports in support of its contention that Cemtrex and Cemtrex's investors suffered pecuniary harm as a result of Govil's fraud.  Saagar Govil, Cemtrex's CEO and Govil's son, testified that his father's actions caused Cemtrex to overstate its financial health in public filings.  (ECF No. 57-24 ¶ 8.)  "[F]or the fiscal year ended 2018, [Cemtrex] recorded $5.7 million of the sums Aron Govil misappropriated as (intangible) assets on its balance sheet, representing over 8% of [Cemtrex's] reported $67.3 million in assets during that period."  (*Id.*)  "[Cemtrex] also recorded an additional $1.4 million of the sums Aron Govil misappropriated as corporate advertising and research and development expenditures, when they were not, in fact, spent for those purposes."  (*Id.*)  The SEC's expert, Dr. Martynova, opined that such misreporting caused Cemtrx to overstate its cash and cash equivalent balances

6

by approximately 47% and 65% in its 2017 and 2018 fiscal years, respectively.[1]  (Martynova Report ¶ 36.)  Cemtrex's public misstatements inflated Cemtrex's market value by 26.7%, meaning that investors who purchased Cemtrex common stock at that time were subject to an inflated share price as a result of Govil's fraud.  (Martynova Report ¶ 39.)

Govil's fraud also "contributed significantly to Cemtrex's need to raise more capital through offerings in the markets than it otherwise would have."  (ECF No. 57-24 ¶ 7.)  Saagar Govil identified a secondary stock offering announced on August 21, 2018 and a rights offering announced in November 2018 as capital-raising efforts that were necessary because of Govil's fraud and testified that each offering "had a dilutive effect on existing Cemtrex shareholders." (*Id.* ¶¶ 7(a), 7(b).)  Dr. Martynova performed an event study that identified statistically significant and abnormal negative returns in response to the announcements of the August and November 2018 offerings.  (Martynova Report ¶¶ 47-49.)  "Given that Cemtrex would not have needed to pursue the two offerings in 2018 absent the misappropriations by [] Govil, the negative significant stock price declines associated with the announcements of the 2018 offerings reflect the dissipation of inflation that resulted from [] Govil's misconduct."  (*Id.* ¶ 50.)  At least two investors who purchased Cemtrex common stock at an artificially inflated price, Joe Kraut and Gregory B. Bultman, were participants in the Offerings themselves.  (ECF No. 57-27 ¶¶ 3, 5, 7; ECF No. 57-28 ¶¶ 3-5, 6, 13-14.)  Bultman, for example, purchased shares in Cemtrex common stock in September 2016, then participated in the fraudulent December 2016 subscription rights offering, and then sold shares of his common stock following the company's August 2021

---

[1] Govil does not challenge Dr. Martynova's qualifications to serve as an expert in this case.  Given Dr. Martynova's credentials and subject-matter expertise, she is well-qualified to act as an expert witness in this case.  *See SEC v. iFresh, Inc.*, No. 22-CV-3200, 2024 WL 416709, at *4 (E.D.N.Y. Feb. 5, 2024) (noting Dr. Martynova's "ample education, expertise, and experience in estimating stock price inflation and ill-gotten gains").

offering announcement.  (ECF No. 57-28.)  Bultman lost $3,362 investing in Cemtrex common stock and $8,505 investing in the December 2016 Offering.  (*Id.* ¶¶ 13-14.)

The record establishes that investors in Cemtrex suffered pecuniary harm as a result of Govil's fraud.  "Trading losses caused by deceptive and manipulative conduct satisfy the pecuniary harm requirement."  *SEC v. Airborne Wireless Network*, No. 21-CV-01772, 2024 WL 4891899, at *8 (S.D.N.Y. Nov. 26, 2024) (citing *SEC v. O'Brien*, No. 23-1071, 2024 WL 2813722, at *2 (2d Cir. Jun. 3, 2024) (summary order)).  Here, the SEC has offered a sworn declaration by a Cemtrex investor declaring that he lost thousands of dollars investing in the December 2016 Offering and investing in common stock that he sold only after Cemtrex announced its August 2021 offering that was made necessary by Govil's fraud.  (ECF No. 57-28 ¶¶ 13-14.)  Moreover, Dr. Martynova's unrebutted finding of artificially inflated stock prices as a result of Govil's deception independently establishes the requisite pecuniary harm.  *SEC v. iFresh, Inc.*, No. 22-CV-3200, 2024 WL 416709, at *3 (E.D.N.Y. Feb. 5, 2024) ("The SEC's allegation that iFresh's stock prices were artificially inflated during the relevant time period, taken as true, also establishes the requisite pecuniary harm to those who purchased iFresh stock during that time period.").

The record also establishes that Cemtrex suffered pecuniary harm as a result of Govil's fraud.  This Court did not decide whether Cemtrex was a victim of Govil's fraud in its prior opinion, but the Second Circuit indicated that "[t]he district court may . . . consider whether Cemtrex qualifies as a victim on remand."  *Govil*, 86 F.4th at 98 n.8.  Cemtrex does qualify as a victim.  "Academic research shows that corporate theft, fraud, and misconduct by insiders . . . causes significant harm to companies and their shareholders through immediate financial losses, reduced future profits and growth, and increased costs (legal, compliance, reputational, etc.), all

of which result in erosion of company value." (Martynova Report ¶ 32 (footnotes omitted).) In

a case "involv[ing] the defendant's knowing misappropriation of millions of dollars from his

employer, there [is] no question that the employer had suffered an economic loss." *SEC v.*

*Ripple Labs, Inc.*, No. 20-CV-10832, 2024 WL 3730403, at *6 (S.D.N.Y. Aug. 7, 2024) (citing

*Ahmed*, 72 F.4th at 390-91), *appeal withdrawn sub nom. SEC v. Ripple Labs, Inc.*, No. 24-2648,

2025 WL 2623065 (2d Cir. Aug. 22, 2025). Govil indisputably misappropriated proceeds

reserved for corporate use from Cemtrex. (ECF No. 57-24 ¶¶ 4-7.) Indeed, in fiscal year 2017

alone, "Govil misappropriated more than Cemtrex earned in that year . . . and created a net loss."

(Martynova Report ¶ 35.) "The net losses due to the misappropriated funds in fiscal years 2017

and 2018 created a shortfall in funds available for operating expenses, financing, and

investments." (*Id.* ¶ 36.) Accordingly, Cemtrex suffered a pecuniary harm as a result of Govil's

fraud.

  Govil's arguments in opposition are unavailing. Govil primarily argues that the mandate

rule forecloses consideration of whether investors in Cemtrex's common stock suffered

pecuniary harm, limiting the Court's analysis to investors in the Offerings and to Cemtrex itself.

(Opp. at 6-8.) This argument misconstrues the mandate rule, which merely "compels compliance

on remand with the dictates of the superior court and forecloses relitigation of issues expressly or

*impliedly* decided by the appellate court." *United States v. Ben Zvi*, 242 F.3d 89, 95 (2d Cir.

2001) (quotation marks omitted). The Second Circuit did not expressly or impliedly decide who

could be considered a victim of Govil's fraud and only held that the Court must *determine* who

was a victim of Govil's fraud under a pecuniary harm test.

  In any event, even applying Govil's desired application of the mandate rule, his argument

fails. First, Govil overlooks the evidence submitted by the SEC showing that at least one

investor in one of the Offerings suffered pecuniary harm.  (ECF No. 57-28.)  Moreover, the

Second Circuit explicitly approved consideration of whether Cemtrex qualified as a victim of

Govil's fraud, a point that Govil concedes (Opp. at 6-7), yet Govil makes no effort to rebut a

finding that Cemtrex suffered pecuniary harm.

Accordingly, the Court concludes that disgorgement is appropriate because Cemtrex,

investors in the Offerings, and investors in Cemtrex's common stock suffered pecuniary harm as

a result of Govil's fraud.

### B.    Disgorgement Amount

 "In determining the amount of disgorgement to be ordered, a court must focus on the

extent to which a defendant has profited from his fraud."  *Universal Exp., Inc.*, 646 F. Supp. 2d

at 563; *see also Govil*, 86 F.4th at 105 ("[D]isgorgement is measured by the wrongful gain

obtained by the defendant rather than by the loss to the investor." (quotation marks omitted)).

"Disgorgement need only be a reasonable approximation of profits causally connected to the

violation."  *SEC v. Patel*, 61 F.3d 137, 139 (2d Cir. 1995) (cleaned up).  "Where this assessment

cannot be made with precision, the 'risk of uncertainty . . . should fall on the wrongdoer whose

illegal conduct created that uncertainty.'"  *Universal Exp., Inc.*, 646 F. Supp. 2d at 563 (quoting

*SEC v. Lorin*, 76 F.3d 458, 462 (2d Cir. 1996)).  "Once the SEC has satisfied its burden to

demonstrate such an approximation, the burden shifts to the defendant to demonstrate that he

received less than the full amount . . . sought to be disgorged."  *Id.* (cleaned up).

As this Court noted in its prior opinion, the parties stipulated that $7,335,000 was

transferred from Cemtrex's bank account to Govil's personal bank account, constituting the

"total proceeds of the fraudulent offerings less the amount of the offering expenses and the

amount that remained with the issuer for corporate expenses."  (ECF No. 22 at 3 (quotation

marks omitted).)   The Court declined to deduct any amount from the $7,335,000 based on the

values of the securities Govil surrendered in the Settlement Agreement, on the basis that the transaction did not redress the victims of the scheme. (*Id.* at 5.) However, the Court deducted the amount of the promissory note that was also part of the Settlement Agreement. (*Id.*)

On appeal, the Second Circuit instructed that the Court must offset the total disgorgement award by the amount it determines to be the value of the surrendered securities. *Govil*, 86 F.4th at 106. Because "each payment in satisfaction of disgorgement offsets the overall disgorgement amount," the court held that "a wrongdoer returns 'value' for the purpose of disgorgement whenever he returns property that holds value in his own hands." *Id.* at 106, 107. The court went on to conclude that, "[a]lthough some of the shares were of uncertain value," Govil's Series 1 Preferred stocks certainly had *some* value in Govil's hands, as they were publicly traded and Govil could have sold his shares on the open market. *Id.* at 108 (also noting that, "had Govil sold that volume of shares on the market at once, the price would have declined"). Govil's Series A Preferred shares and Series C Preferred shares may have also had value in Govil's hands, even if they were not publicly traded and did not pay a regular dividend, because their "principal benefit" was "enabl[ing] the holder to control Cemtrex." *Id.* at 108 ("While the accuracy of [the appraiser's] valuation [of the Series A and Series C shares] is a matter for the district court on remand, . . . we cannot say based on the record before us that the control that came along with Govil's interest in those preferred shares was without value.").

In support of its renewed motion, the SEC offers an expert valuation of assets surrendered in the Settlement Agreement that places the total arm's length transaction value of the assets at $664,023. (Martynova Report ¶¶ 113-14.) In contrast, Govil urges reliance on the value agreed upon in the Settlement Agreement, which deemed the surrendered shares to be

worth $5,566,720.  (Opp. at 13-14; ECF No. 57-22 at 2.)  Govil offers no expert testimony or any expert evidence to rebut Dr. Martynova's calculations.

The SEC has the better of the arguments.  As to the promissory note, Dr. Martynova determined that the promised $1,533,280 should not offset the disgorgement amount since Govil has not paid the value on the note.  (*Id.* ¶¶ 110-12.)  As to Govil's forfeiture of outstanding options to purchase shares in Cemtrex common stock, Dr. Martynova concluded that the options had no value in Govil's hands because they were nontransferable, such that exercising the options would be the only way for Govil to earn a benefit, and at the time of the Settlement Agreement, the market price of Cemtrex's common stock was below the option's exercise price.  (*Id.* ¶¶ 100-05.)  That leaves Govil's surrendered stock shares, which is the only valuation that Govil contests.  (*See* Opp. at 16-20.)

To determine the value of Govil's surrendered shares, Dr. Martynova applied a widely accepted valuation approach.  (*Id.* ¶ 60.)  Dr. Martynova concluded that Govil's surrender of 469,949 shares of Series 1 preferred stock had an arm's length value of $662,628.  (Martynova Report ¶ 64.)  This calculation began with the shares' closing price of $2.35 per share on the day of the Settlement Agreement.  (*Id.* ¶ 69.)  Multiplying $2.35 by the number of shares Govil surrendered yields a value of $1,104,380.  (*Id.*)  Dr. Martynova then applied a "blockage discount," which is a common way to account for the likely downward pressure on stock caused by a block sale.  (*Id.* ¶ 69-72 (noting that the surrendered shares constituted 149 days' worth of the total average daily trading volume).)  Dr. Martynova applied a 40% blockage discount—the midpoint of the range supported by academic literature—to reach $662,628.  (*Id.* ¶ 72.)

Dr. Martynova next concluded that the 1,000,000 shares of Cemtrex Series A preferred stock that Govil surrendered were worthless.  (*Id.* ¶¶ 76-80.)  Dr. Martynova noted that Series A

preferred shares did not promise any future cash flows to the holder and were neither registered nor publicly traded.  (*Id.* ¶ 76.)  Moreover, Govil was the sole owner of all Series A shares issued and outstanding, such that the stock lacked marketability and was subject to resale restrictions. (*Id.* ¶ 79 ("[I]t was unlikely that [] Govil would have found a buyer for his Series A shares had he attempted to sell these shares.").)  Accordingly, "[t]he only potentially valuable feature of the stock was its enhanced voting rights as compared to common stock."  (*Id.* ¶ 78.)  The perceived value of voting rights is accounted for through a "control premium" and depends on whether the share block is large enough to provide a controlling stake in the company.  (*Id.* at 62.)  But here, Govil's surrendered Series A preferred shares accounted for only 8.2% of all votes from all of Cemtrex's outstanding equity securities.  Indeed, Govil conceded that his Series A preferred shares did not affect his control over Cemtrex.  (ECF No. 57-29 at 26.)  Thus, "given the lack of any cash flow rights, insufficient voting rights to exert control power, and lack of marketability and regulatory restrictions affecting his ability to sell the shares," Dr. Martynova valued the surrendered Series A shares at $0 per share.  (Martynova Report ¶ 79.)

Lastly, Dr. Martynova determined that the 50,000 shares of Series C preferred stock that Govil surrendered were worth $1,395 in Govil's hands.  (*Id.* ¶ 90.)  Like the Series A preferred stock, Series C preferred stock "had no contractual dividends or other payout rights, no provisions for conversion into common stock or other securities, no liquidation value, and no payout preference," such that, once again, "[t]he only potentially valuable feature of the stock was its enhanced voting rights."  (*Id.* ¶¶ 91-92.)  However, each Series C share carried 1,764 votes per share, as compared to the 17.8 votes per share offered by each Series A shared.  (*Id.* ¶¶ 78, 92.)  And because Govil owned 50,000 shares representing 50% of the issued and outstanding shares of Series C stock, he had 40.7% of all votes from all Cemtrex's equity

securities outstanding, sufficient for him to exert control over the company.  (*Id.* ¶ 92.)  Relying on academic studies that estimate the difference in prices of voting stock relative to non-voting stock at 2.5% and the average control premium for U.S. companies between 1% and 2%, Dr. Martynova applied a 2.5% control premium to the price of Cemtrex's common stock on the date of the Settlement Agreement, $1.86, yielding an estimate of $0.05 per share.  (*Id.* ¶ 94.) Multiplying the estimated share price by 50,000 yields a total of around $2,500.  (*Id.*)  Dr. Martynova then applied a discount, given that the Series C stock lacked marketability and the high volume of sale.  Again applying the 40% blockage discount as she did with the Series 1 stock, Dr. Martynova determined that the actual Series C value was $0.03 per share, such that the total value of the surrendered shares was $1,395.  (*Id.* ¶ 95.)

In short, Dr. Martynova concluded that the value of Govil's surrendered assets amounted to the sum of $662,628 and $1,395, totaling $664,023.  These calculations and Dr. Martynova's unrebutted expert report satisfy the SEC's burden to demonstrate an approximation of the disgorgement amount.  *Universal Exp., Inc.*, 646 F. Supp. 2d at 563.  Accordingly, the burden shifted to Govil to show that more should be offset from the agreed-upon total amount that he wrongly obtained.  *Id.*

Govil has failed to meet that burden.  As to the Series 1 preferred shares, Govil urges the Court to accept the $5.50 per share value assigned in the Settlement Agreement because the negotiations were done at arms' length, and because the valuation above the closing price can be attributed to Cemtrex's willingness to pay more to retire the shares and alleviate its dividend obligations.  (Opp. 13-14, 16-17.)  But as the SEC correctly points out, there is good reason to doubt that the Settlement Agreement was truly an arm's length transaction:  Govil controlled Cemtrex, which was represented by Verma, Govil's longtime friend and a Cemtrex director

whom Govil could fire at will.  (ECF No. 57-29 at 45-46; ECF No. 57-30 at 14.)  Furthermore, Govil erroneously argues for an upward variation from the closing price based on the value of the shares to Cemtrex, when the Second Circuit made clear that the only relevant inquiry is whether the property held value in the wrongdoer's hands.  *Govil*, 86 F. 4th at 107-08.  And even if the Court were to consider the stock's value to Cemtrex, Cemtrex itself disavowed the $5.50 per share valuation set forth in the Settlement Agreement when it valued the shares for financial reporting purposes.  (Martynova Report ¶ 75 (noting that Cemtrex opted to record the fair value of the Series 1 shares by utilizing the market price of the stock on the date of the agreement).)  Moreover, Govil has failed to offer any reliable evidence as to why the 40% blockage discount should not apply or to propose any alternative methodology for calculating the appropriate value.

Govil fares no better with the Series A and Series C shares.[2]  Govil argues that the Series A shares have value because they still offer *some* voting rights, even if only amounting to 8.2% of all votes from Cemtrex's equity securities outstanding.  (Opp. at 18; Martynova Report ¶ 78.)  Govil offers no cases in support of the proposition that a control premium should apply to such a small fraction of voting shares.  Instead, control premia are commonly understood to be paid only "for shares carrying the power to *control* a corporation."  *Premium*, Black's Law Dictionary (12th ed. 2024) (emphasis added).  Govil has offered no evidence that his ownership of the

---

[2] In a footnote, Govil disagrees with the SEC's and Dr. Martynova's position that the Stonebridge appraisals, which considered only the Series A and Series C shares, were riddled with errors.  (*See* Martynova Report ¶¶ 82-84, 97; Opp. at 20 n.3.)  Govil did not offer the appraiser as an expert and offers no argument for why Dr. Martynova's assessment of the errors in the Stonebridge appraisal are wrong.  A bare assertion in a footnote is not enough to preserve Govil's argument that the Stonebridge appraisals are to be credited.  *See Arkansas Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 83 n.1 (2d Cir. 2023).  In any event, the Court agrees with Dr. Martynova's assessment of the many flaws in the appraisals, as recognized by the appraiser himself.  (*See* ECF No. 57-33 at 51 ("I apologize.  This is probably the worst work I've ever seen from anybody.").)

Series A shares gave him power to *control* Cemtrex, even if it did give him some non-negligible voting rights. Instead, as Govil admitted, it was his ownership of the Series C shares that gave him control. (ECF No. 60-2 ¶ 28 ("To my knowledge, Cemtrex's valuation of my shares incorporated a control premium, since Cemtrex obtained voting control when it purchased my shares (*specifically my Series C Preferred Shares*)." (emphasis added)); ECF No. 57-29 at 26.) Govil likewise challenges the value Dr. Martynova applied to his surrendered Series C shares as "ridiculous," arguing that Dr. Martynova wrongly assumed the stock owner "should have monetary benefits to get access to higher control premiums." (Opp. at 19.) But Dr. Martynova reasonably determined that, because Govil's Series C shares lacked any cash flow rights, they were subject to a low-value control premium compared to control premia reflecting both cash flow benefits and the actual control premium. (Martynova Report ¶ 94.) Dr. Martynova based this conclusion on academic studies and even applied the upper bound of the range supported in the literature. (*Id.*) Govil failed to offer any expert response or even any argument as to what methodology would be better-suited to determining the control premium.

In sum, the Court concludes that the SEC's requested disgorgement amount of $6,670,977 is proper because Govil's surrender of assets in the Settlement Agreement amounts to a value of only $664,023.

### C.    Prejudgment Interest

"The decision whether to grant prejudgment interest and the rate used if such interest is granted are matters confided to the district court's broad discretion." *SEC. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1476 (2d Cir. 1996) (quotation marks omitted). "In deciding whether an award of prejudgment interest is warranted, a court should consider (i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such

other general principles as are deemed relevant by the court." *Id.* (quotation marks omitted). "In an enforcement action brought by a regulatory agency, the remedial purpose of the statute takes on special importance." *Id.*

On remand, the SEC offers a calculation of prejudgment interest totaling $3,037,615.59. (ECF No. 58-1 at 3.) Govil does not challenge this calculation or offer an alternative one, and instead argues only that prejudgment interest is not warranted because he had already surrendered the partial value of the disgorgement through the Settlement Agreement. (Opp. at 20-21.) But as discussed above, the Settlement Agreement greatly inflated the actual value of the surrendered assets. Accordingly, "prejudgment interest is necessary to capture the full measure of the defendant's ill-gotten gains," *Universal Express, Inc.*, 646 F. Supp. 2d at 566, particularly because this is an enforcement action brought by the SEC, *First Jersey Sec., Inc.*, 101 F.3d at 1476.

## IV.    Conclusion

For the foregoing reasons, the SEC's motion for judgment imposing additional remedies is GRANTED. Judgment shall be entered against Govil in the amount of $9,708,592.59, which consists of $6,670,977 in disgorgement and $3,037,615.59 in prejudgment interest.

The Clerk of Court is directed to close the motion at Docket Number 55 and to enter judgment accordingly.

SO ORDERED.

Dated:  January 20, 2026
      New York, New York

                                                   J. PAUL OETKEN
                                      United States District Judge